**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| Kevin K. Scott, | : | Case No. 1:10 CV 0061 |
| Plaintiff, | : | |
| v. | : | |
| Commissioner of Social Security, | : | **MAGISTRATE'S REPORT AND RECOMMENDATION** |
| Defendant. | : | |

Plaintiff seeks judicial review, pursuant to 42 U. S. C. § 405(g), of Defendant's final determination denying his Title II application for a period of disability and disability insurance benefits (DIB) and Title XVI application for supplemental security income (SSI). Pending are the parties' Briefs on the Merits and Plaintiff's Reply Brief (Docket Nos. 12, 13 & 16). For the reasons set forth below, the Magistrate recommends that the Court remand this case to the Commissioner for further consideration of Plaintiff's residual functional capacity (RFC).

**I**. **PROCEDURAL BACKGROUND.**

On September 6, 2007, Plaintiff filed applications for DIB and SSI, alleging that he became disabled on September 17, 2006 (Docket No. 10, Exhibit 7, pp. 2 - 8 of 26). Plaintiff's requests for SSI and DIB benefits were denied initially and upon reconsideration (Docket No. 10, Exhibit 5, pp. 2-4, 5-7, 12 - 14, 16-18, 19 - 21, 23 - 25 of 32). On February 26, 2009, Administrative Law Judge (ALJ) Mark

M. Carissimi held an administrative hearing at which Plaintiff, represented by counsel and accompanied by Ms. Bordia Smith Milligan, and a Vocational Expert (VE) Ted Macy testified (Docket No. 10, Exhibit 3, p. 2 of 37). On April 9, 2009, the ALJ rendered an unfavorable decision (Docket No. 10, Exhibit 2, pp. 7-21 of 21). The Appeals Council denied Plaintiff's request for review on December 14, 2009, thereby rendering the ALJ's decision the final decision of the Commissioner (Docket No. 10, Exhibit 2, pp. 2-5 of 21). Plaintiff filed a timely action seeking judicial review of the Commissioner's final decision.

## II. JURISDICTION

This Court exercises jurisdiction over the final decision of the Commissioner pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3). *McClanahan v. Commissioner of Social Security,* 474 F.3d 830, 832 -833 (6th Cir. 2006).

## III. FACTUAL BACKGROUND

A.     **PLAINTIFF'S TESTIMONY.**

Plaintiff was transferred to special education classes during the first grade. Although he completed high school, Plaintiff described himself as illiterate. He could not pronounce words phonetically. In fact, he could not read or comprehend the meaning of words "at all." He could not read the newspaper (Docket No. 10, Exhibit 3, p. 9-10 of 37). Plaintiff took the audio version of the driver's test. He explained that he could read street signs after taking a class and continued study (Docket No. 10, Exhibit 3, p. 10 of 37). Nevertheless, he was afraid to drive (Docket No. 10, Exhibit 3, p. 14 of 37).

Plaintiff claimed that he had four impairments: hyperactive thyroid, asthma, chest pains and headaches. Weather changes appeared to trigger asthma attacks. He used a nebulizer to deliver asthma

2

treatments (Docket No. 10, Exhibit 3, pp. 6 of 37).

Plaintiff had episodes of chest pain for fifteen minutes daily. He characterized the pain as a seven to eight on an ascending scale of one to ten with ten indicating severe pain. His pain was accompanied by tears. He treated the pain symptoms with an aspirin and rest for approximately a half hour. Lifting brought on chest pain and dyspnea (Docket No. 10, Exhibit 3, pp. 7-8 of 37)

The thyroid medication caused fatigue and weakness (Docket No. 10, Exhibit 3, p. 8 of 37).

Plaintiff had headaches daily which lasted approximately one hour. The headaches, like his chest pain, waxed and waned. To treat the pain, he took Tylenol® (Docket No. 10, Exhibit 3, p. 8 - 9 of 37).

Plaintiff resided with his mother and stepfather. Plaintiff slept "a lot" because of his thyroid medication. During a typical day, Plaintiff arose and watched television. His attention span was limited so he moved frequently. Movement and excessive standing triggered dizziness. He would then recline. Occasionally he made his bed but his mother assisted him with cleaning his room. Exertion precipitated dyspnea (Docket No. 10, Exhibit 3, p. 13 of 37).

Plaintiff estimated that he could stand no more than twenty minutes before he got dizzy. He would lie down for up to a half hour before he could sit up and watch television (Docket No. 10, Exhibit 3, p. 14 of 37).

While in high school, Plaintiff was a participant in the LEAP program, a specialized educational development program available to special education identified students (Docket No. 10, Exhibit 3, p. 20 of 37; http://222theleapprogram.net). LEAP personnel assisted Plaintiff with making applications and reading any written instructions (Docket No. 10, Exhibit 3, p. 23 of 37).

During high school, Plaintiff was employed at T & T Fashions for approximately twenty-six

hours weekly. His responsibilities included selling the clothes. He did not close the sale by running the cash register or collecting payments (Docket No. 10, Exhibit 3, pp. 20-21, 25 of 37).

In 2005, Plaintiff was employed at Ganley Ford as an auto detailer. In 2007, Plaintiff was transferred to the Ganley Oldsmobile division. There he could work at an unspecified pace (Docket No. 10, Exhibit 3, p. 19 of 37). In completing car detailing, Plaintiff was responsible for vacuuming the interior of cars and washing the exterior of cars. He engaged in frequent movements and occasionally lifted up to twelve pounds. While his co-workers completed five to six cars daily, Plaintiff focused on completing one or two cars daily (Docket No. 10, Exhibit 3, pp. 15, 16, 22 of 37). Later, Plaintiff attempted to work through an employment agency but he could not stand up for a long period of time (Docket No. 10, Exhibit 3, p. 17 of 37).

On April 21, 2007, Plaintiff was being treated for dyspnea after a friend came to visit. Apparently, Plaintiff and his friend were wrestling and Plaintiff was bitten when he put his friend in a head lock (Docket No. 10, Exhibit 3, p. 30 of 37).

**B.      WITNESS TESTIMONY**.

Ms. Bordia Smith Milligan, Plaintiff's mother, testified that Plaintiff was doing well until he had a hyperactive thyroid attack (Docket No. 10, Exhibit 3, p. 25 of 37). Ms. Milligan claimed that Plaintiff tried to perform certain household tasks but she was not satisfied with his manner of completing those tasks. In addition, when he stood up, he got dizzy or had a headache. She noted that Plaintiff's physician advised him against lifting more than ten pounds (Docket No. 10, Exhibit 3, p. 26 of 37).

Ms. Milligan opined that Plaintiff was depressed as evidenced by his reclusiveness, complaints of fatigue and incessant sleeping. Ms. Milligan confirmed that she assisted Plaintiff with completion of all forms submitted for Social Security eligibility (Docket No. 10, Exhibit 3, pp. 28-29 of 37).

C.   **VOCATIONAL EXPERT TESTIMONY.**

In the first hypothetical question, the ALJ requested that the VE consider a claimant who, *inter alia*, was twenty years of age and had a high school special education diploma and no past relevant work history, limited to: (1) lifting and carrying up to fifty pounds occasionally, (2) lifting and/or carrying twenty-five pounds frequently, (3) standing and walking for six hours of an eight hour day, (4) sitting for six hours in an eight hour day, (5) pushing or pulling up to fifty pounds occasionally and twenty-five pounds frequently, (6) performing simple, repetitive work that did not require high production quotas, (7) receiving instructions given by demonstration or orally, and (8) superficial interaction with co-workers and the public. The VE explained that given these conditions of employment, the hypothetical worker could perform the job of a laundry laborer, hand packager and bench assembler (Docket No. 10, Exhibit 3, pp. 32, 33, 34 of 37).

The laundry laborer position, as described at 361.687-018 of the Dictionary of Occupational Titles (DOT), is a medium, unskilled job. Those laundry laborer jobs that would require exposure to environmental limitations such as extremes of heat and dust would be eliminated. Consequently, there would be 650 jobs in Northeast Ohio and approximately 95,000 jobs nationally that could accommodate the hypothetical claimant (Docket No. 10, Exhibit 3, pp. 32-33 of 37).

The hand packager job, as described at 920.587-018 of the DOT, is a medium, unskilled job. The hand packager puts items into a bag or box and seals the bag or box with tape or staples. There were 600 jobs in Northeast Ohio and nationally, approximately 75,000 jobs (Docket No. 10, Exhibit 3, pp. 33-34-35 of 37).

The bench assembler job, referenced in DOT at 706.684-022, is a light, unskilled job. A bench assembler puts together small parts that may require nuts and bolts. The parts may then be placed in

5

paper bags or plastic bags and then stockpiled. Within the hypothetical, there are 900 jobs in Northeast Ohio and 175,000 jobs nationally (Docket No. 10, Exhibit 3, p. 34-35 of 37).

In a second hypothetical, the ALJ proposed that the VE consider a claimant with the same characteristics established in the first hypothetical, however, because of difficulties with maintaining persistence, pace and fatigue, he or she would be off task 20% of the time. The VE responded that including these limitations, there would be no jobs at a competitive level that the claimant could perform without special accommodation (Docket No. 10, Exhibit 3, pp. 34-35 of 37).

Reducing the characteristics of the hypothetical to light work and adding that the hypothetical claimant should avoid concentrated exposure to cold, heat, smoke, fumes, odors, dust, gases and poor ventilation, would eliminate the laundry laborer job. The bench assembler position would remain, with the same numbers as previously listed (Docket No. 10, Exhibit 3, p. 36 of 37).

### IV. SUMMARY OF MEDICAL EVIDENCE.

Plaintiff underwent a psychological evaluation on March 31, 2000. Dr. J. Joseph Konieczny, Ph.D., administered the Wechsler Intelligence Scale for Children–III (WISC-III), the Wide Range Achievement Test 3 (WRAT3), the Vineland Adaptive Behavioral Scales and the Bender Gestalt test to Plaintiff. A parental interview was also conducted.

Dr. Konieczny compared the results from the WISC-III, a test designed to test children's general intellectual ability, administered in May 1996 through a school evaluation to the test administered in 2000. In May 1996, Plaintiff achieved a verbal IQ of 67, a performance IQ of 75 and a full scale IQ of 69. The results from the March 2000 test showed a verbal IQ of 66, performance IQ of 81 and full scale IQ of 71. Dr. Konieczny noted that the current results were fairly reflective of the previous testing. All of the results from the WISC-III placed Plaintiff's full scale intelligent quotient (IQ) in the borderline

range of intellectual functioning for an individual of his age. His scores showed that his verbal skills were deficient and his performance skills were in the low average range (Docket No. 10, Exhibit 9, p. 4 of 15) (http://en.wikipedia.org/wiki/Wechsler_Intelligence_Scale_for_Children).

The results from the WRAT, an achievement test that measures reading, spelling and arithmetic computation, showed that Plaintiff's capabilities in the area of arithmetic lie in the borderline range and are reflective of his overall level of intellectual functioning. In the areas of spelling and reading, Plaintiff's capabilities were in the deficient range and were suggestive of a reading disorder (Docket No. 10, Exhibit 9, p. 4 of 15; www.WRAT.com).

The results from the Vineland Adaptive Behavior Scales, a test designed to assess the personal and social functioning of disabled persons, showed that Plaintiff's adaptive capabilities in the area of socialization lie in the borderline to deficient range. In the areas of daily living, Plaintiff's adaptive capabilities were within the deficient range. In the area of receptive communications, Plaintiff's capabilities were regarded as adequate. Plaintiff's overall level of adaptive functioning was within the deficient range (Docket No. 10, Exhibit 9, p. 4 of 15; www.vineland.com).

The results from the Bender Gestalt, a test designed primarily to screen for developmental disorders or assess neurological function or brain damage, were not indicative of any perceptual motor impairment or any distortion of an overall configuration. There was no evidence of organicity or organic impairment (Docket No. 10, Exhibit 9, p. 4 of 15; www.bender-gestalttest.com).

Dr. Konieczny's overall diagnostic impression was that Plaintiff had a reading disorder, borderline intellectual functioning, and moderate symptoms or moderate difficulty in social, occupational or school functioning (Docket No. 10, Exhibit 9, p. 6 of 15).

On April 6, 2004, Plaintiff underwent another psychological evaluation during which Dr. David

V. House, Ph.D., administered the WAIS, Wechsler Memory Scale III (WMS-III) and WRAT. The WAIS results showed a verbal IQ of 75, a performance IQ of 84 and a full scale IQ of 77 (Docket No. 10, Exhibit 9, p. 12 of 15). Dr. House opined that these scores qualified Plaintiff for a diagnosis of borderline intellectual functioning (Docket No. 10, Exhibit 9, p. 13 of 15).

On the WMS-III, a measure of memory and attention functions using both auditory and visual stimuli, Plaintiff's scores were consistent with the performance on WAIS even though somewhat reversed. Plaintiff's overall cognitive skills fell within the borderline range (Docket No. 10, Exhibit 9, p. 13 of 15; http://www.cps.nova.edu/~cpphelp/WMS-3.html).

The results from the WRAT reading subtest showed that Plaintiff was illiterate (Docket No. 10, Exhibit 9, p. 14 of 15).

Overall, Dr. House's diagnostic impression included reading and learning disorders, borderline intellectual functioning and moderate symptoms or moderate difficulty in social, occupational, or school functioning (Docket No. 10, Exhibit 9, p. 15 of 15).

Plaintiff presented to the Lakewood Radiology on July 19, 2006, with chest pain. The results of extensive tests showed no reversible defects to suggest a restriction of the blood supply at stress levels. There was evidence of diaphragmatic attenuation and apical thinning. However, myocardial infarction was ruled out. When the chest x-ray was compared to prior studies, the results were within normal limits. The lungs were clear, without focal infiltrate or acute pleural process. There was no significant valvular abnormality and the bi-ventricular function was within a normal range (Docket No. 10, Exhibit 10, pp. 3- 39 of 39).

At the University Hospitals of Cleveland, Plaintiff obtained excuses from work from July 24 to July 27, 2006; August 8 to August 9, 2006; and September 22 through November 30, 2006 (Docket No.

10, Exhibit 12, p. 46-48 of 48).

Plaintiff presented to the University Hospitals of Cleveland on April 21, 2007, with a complaint of asthma and chest tightness. The results of the electrocardiogram showed evidence of a regular but unusually slow heart rate. Upon discharge, the chest tightness and low heart rate were controlled and Plaintiff was advised to return if any acute symptoms arose (Docket No. 10, Exhibit 11, pp. 3 - 11 of 11; Exhibit 12, pp. 2 -12 of 48).

Dr. Catherine Flynn, Psy.D., conducted the mental RFC assessment on October 22, 2007. She determined that Plaintiff had no marked limitations in understanding, memory, sustained concentration and persistence, social interaction and adaptation. Plaintiff did, however, have moderate limitations in his ability to (1) respond appropriately to changes in the work setting, (2) carry out detailed instructions and (3) understand and remember detailed instructions (Docket No. 10, Exhibit 12, pp. 13 of 38 - 14 of 38). Dr. Flynn opined that Plaintiff had the capacity to do simple, routine work with infrequent changes (Docket No. 10, Exhibit 12, p. 15 of 48).

The assessment of mental RFC completed by Dr. Flynn on October 22, 2007, indicated that Plaintiff had a medically determinable impairment that did not meet 12.05 of the Listing. Nevertheless, Plaintiff had reading and learning disorders as well as borderline intellectual functioning (Docket No. 10, Exhibit 12, p. 21 of 48). She concluded that Plaintiff had a mild degree of functional limitations in the restriction of activities of daily living. Plaintiff had no difficulties in maintaining social functioning and Plaintiff had only moderate difficulties in maintaining concentration, persistence or pace. There were no episodes of deterioration in his mental health (Docket No. 10, Exhibit 12, p. 27 of 48).

Plaintiff was treated at St. David's Georgetown Hospital for chest pain and hypothyroidism on February 2, 2008. The attending physician opined that Plaintiff's condition did not seem serious at that

time and the pain did not appear to be coming from the heart. The attending physician ordered Plaintiff to refrain from strenuous activity and commence taking his current medications regularly (Docket No. 10, Exhibit 12, p. 39 of 48).

In June 2008, Plaintiff admitted that he had not taken the medication that controlled the levels of hormone produced by the thyroid as prescribed. Plaintiff presented to the Northeast Ohio Neighborhood Health Services to undergo tests that detect complications arising from the thyroid gland. The thyroid medication was prescribed again (Docket No. 10, Exhibit 12, p. 42 of 48).

On November 1, 2008, Dr. Maria Congbalay, M.D., performed an assessment of Plaintiff's physical RFC and determined that Plaintiff had no exertional, postural, manipulative, visual or communicative limitations (Docket No. 10, Exhibit 12, pp. 32-35 of 48). Concentrated exposure to extreme cold and heat as well as fumes, odor, dusts, gases and poor ventilation was contraindicated (Docket No. 10, Exhibit 12, p. 35 of 48).

## V. STANDARD OF DISABILITY

DIB and SSI are available only for those who have a "disability." *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007) (*citing* 42 U.S.C. § 423(a), (d); See also 20 C.F.R. § 416.920)). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id*. (*citing* 42 U.S.C. § 423(d)(1)(A) (definition used in the DIB context); See also 20 C. F. R. § 416.905(a) (same definition used in the SSI context)).

The Commissioner's regulations governing the evaluation of disability for DIB and SSI are identical for purposes of this case, and are found at 20 C. F. R. § 404.1520, and 20 C. F. R. § 416.920

respectively. To assist clarity, the remainder of this Report and Recommendation references only the DIB regulations, except where otherwise necessary.

To determine disability under Sections 404.1520 and 416.920, the claimant must first demonstrate that he or she is not currently engaged in "substantial gainful activity" at the time he or she seeks disability benefits. *Id.* (*citing Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)). Second, the claimant must show that he or she suffers from a "severe impairment" in order to warrant a finding of disability. *Id.* A "severe impairment" is one which significantly limits the claimant's physical or mental ability to do basic work activities. *Id.* Third, if the claimant is not performing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his or her impairment meets or equals a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience. *Id.* Fourth, if the claimant's impairment does not prevent him or her from doing her or his past relevant work, the claimant is not disabled. *Id.* For the fifth and final step, even if the claimant's impairment does prevent her or him from doing her or his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. *Id.* (*citing Heston v. Commissioner of Social Security*, 245 F.3d 528, 534 (6th Cir. 2001)(internal citations omitted) (second alteration in original)).

During the first four steps of this five-step sequential analysis, the claimant has the burden of proof. *Walters v. Commissioner*, 127 F. 3d 525, 529 (6th Cir. 1997). This burden shifts to the Commissioner only at Step Five. *Id.* (*see Young v. Secretary of Health and Human Services,* 925 F. 2d 146, 148 (6th Cir. 1990) (*citing Allen v. Califano,* 613 F. 2d 139, 145 (6th Cir. 1980); *Cole v. Secretary of Health and Human Services,* 820 F. 2d 768, 771 (6th Cir. 1987)). If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates. *Colvin, supra*, 475 F.

3d at 730 (*citing* 20 C. F. R. § 404.1520(a)(4); 20 C. F. R. § 416.920(a)(4)).

## VI. ALJ DETERMINATIONS

After consideration of the entire record, the ALJ made the following findings of facts:

1. Plaintiff met the insured status requirements of the Social Security Act (Act) through June 30, 2008. He had not engaged in substantial gainful activity since September 17, 2006.

2. Plaintiff had severe impairments including borderline intellectual functioning, reading disorder, learning disorder, asthma and hypothyroidism. These impairments, individually and in combination, did not meet or medically equal one of the listing impairments in 20 C. F. R Part 404, Subpart P, Appendix 1.

3 Plaintiff had the RFC to perform medium work limited to simple, repetitive work without high production quotas, oral instructions or by demonstration, superficial interaction with the public and co-workers without negotiation or confrontation and no exposure to extreme temperatures or concentrated amounts of smoke and fumes

4. Plaintiff, a younger individual, had at least a high school education, was able to communicate in English and had no past relevant work history. Considering his age, work experience and RFC, there were jobs that exist in significant numbers in the national economy that Plaintiff could perform.

5. Plaintiff was not under a disability as defined in the Act from September 17, 2006, through the date of the decision on April 9, 2009.

(Docket No. 10, Exhibit 2, pp. 7-21 of 21).

## VII. STANDARD OF REVIEW

The district court must affirm the Commissioner's conclusions unless the Commissioner failed to apply the correct legal standard or made findings of fact that are unsupported by substantial evidence. *McClanahan, supra*, 474 F.3d 830 at 833 (*citing Branham v. Gardner*, 383 F.2d 614, 626-627 (6th Cir. 1967)). In fact, the Commissioner's findings as to any fact shall be conclusive if supported by substantial evidence. *Id*. (*citing* 42 U.S.C. § 405(g )). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept

12

as adequate to support a conclusion." *Id.* (*citing Besaw v. Secretary of Health and Human Services*, 966 F.2d 1028, 1030 (6th Cir. 1992)). "The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. . . . This is so because there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference." *Id.* (*citing Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001) (citations omitted)). Therefore the reviewing court may not try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility. *Cutlip v. Secretary of Health and Human Services*, 25 F.3d 284, 286 (6th Cir. 1994) (*citing Brainard v. Secretary of Health and Human Services*, 889 F. 2d 679, 681 (6th Cir. 1989); *Garner v. Heckler*, 745 F. 2d 383, 387 (6th Cir. 1984)).

## VIII. PLAINTIFF'S POSITIONS.

Substantial evidence does not support the ALJ's finding that Plaintiff is not disabled. Plaintiff contends that three reasons exist for reversing and/or remanding this case to the Commissioner.

1. Plaintiff argues that the ALJ's finding that he can perform a limited range of jobs is not supported by the evidence.

2. Plaintiff argues that the jobs identified by the VE were not responsive to the ALJ's hypothetical; thus, the ALJ's reliance on the VE's testimony is contrary to law.

3. Plaintiff argues that the ALJ erred in finding that he could perform a job with **any** production expectancy.

## IX. DEFENDANT'S POSITIONS.

Defendant argues that the ALJ's decision is supported by substantial evidence and that reversal and/or remand are not warranted for two reasons.

1. Defendant contends that the ALJ's RFC assessment is supported by substantial evidence.

2. Defendant contends that the ALJ reasonably relied on the VE's testimony.

### X. ANALYSIS.

**A. REGULAR AND CONTINUING BASIS.**

Plaintiff challenges the ALJ's decision as he failed to address whether Plaintiff could maintain sustained work activities considering the likelihood that he needed to take frequent breaks and/or he would be off task for 20% of the time. These limitations are consistent with an inability to perform sustained work activities on a regular and continuing basis.

Social Security regulations define RFC as the physical ability to perform work activity on a regular and continuing basis. 20 C. F. R. § § 404.1545(b); 416.945(b) (Thomson Reuters 2010). Residual functional capacity is an assessment of the individual's ability to do 'sustained work related physical and mental activities in a work setting on a regular and continuing basis which means eight hours a day, for five days a week, or an equivalent work schedule.' TITLES II AND XVI: ASSESSING RESIDUAL FUNCTIONAL CAPACITY IN INITIAL CLAIMS, SSR 96-8p, 1996 WL 374184 (July 2, 1006). Thus, a RFC assessment **must** include a discussion of the individual's abilities on that basis. *Id.*

The ALJ acknowledges that an individual's RFC is the ability to do physical and mental work activities on a sustained basis despite limitations from his impairments (Docket No. 10, Exhibit 2, p. 12 of 21). However, he failed to explain whether he considered such abilities on a sustained basis in assessing RFC. On remand, the ALJ **must** consider the regulations that require an assessment of Plaintiff's abilities on a sustained basis.

**B. SPECIFIC VOCATIONAL PREPARATION (SVP).**

In his second claim, Plaintiff maintains that the jobs identified by the VE required a higher skill

level than he is capable of performing. The jobs of bench assembler, hand packager and laundry laborer require a period of training beyond a short demonstration up to and including one month.

Occupational evidence provided by a VE or VS generally should be consistent with the occupational information supplied by the DOT. POLICY INTERPRETATION RULING: TITLES II AND XVI: USE OF VOCATIONAL EXPERT AND VOCATIONAL SPECIALIST EVIDENCE, AND OTHER RELIABLE OCCUPATIONAL INFORMATION IN DISABILITY DECISIONS, SSR 00-4p, 2000 WL 1898704, *2 (2000). When there is an apparent unresolved conflict between VE or VS evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE or VS evidence to support a determination or decision about whether the claimant is disabled. *Id.* At the hearings level, as part of the adjudicator's duty to fully develop the record, the adjudicator will inquire, on the record, as to whether or not there is such consistency. *Id.*

The DOT lists a SVP time for each described occupation. APPENDIX C–COMPONENTS OF THE DEFINITION TRAILER, 1991 WL 688702, 4th ed., rev. 1991 (Thomson Reuters 2010). SVP refers to the level which is defined in the DOT as "the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." *Id.* An SVP represents the **maximum** requirement for occupations as generally performed, not the minimal requirements. *Id.* An SVP of one requires a "short demonstration only" and a two denotes "anything beyond short demonstration up to an including one month. *Id.*

The Magistrate acknowledges that the ALJ found that Plaintiff can learn the techniques required to perform work as laundry laborer, hand packager or bench assembler provided he is given instructions orally or by demonstration. The level of time required to learn the job-specific skills is consistent with the method by which the instruction is conveyed. It is presumed that Plaintiff can perform a job that

requires anything beyond a short demonstration up to an including one month if the instruction is presented orally and demonstratively. Reliance on a finding that Plaintiff can perform work that has an SVP of two in this case does not warrant reversal or remand.

**C.     PRODUCTION QUOTAS.**

The ALJ found that Plaintiff has the RFC to perform medium work limited to simple, repetitive work without high production quotas. Plaintiff contends that he has moderate limitation in his ability to maintain concentration, persistence or pace; consequently, he would have trouble performing a job with **any** production expectancy.

The Magistrate finds that the ALJ's finding that Plaintiff can perform work that does not encompass high production quotas is consistent with Plaintiff's contention that he cannot perform work with any production expectancy. However, the jobs presented by the VE, the jobs of hand packager, bench assembler and laundry laborer, do not require an ability to maintain concentration, persistence or pace. Each job requires a markedly low aptitude ability for performing repetitive or short cycle work. In other words, when a task is completed or production needs are adjusted, the employee moves on to another task or is reassigned another task within the same occupational group arrangement. There is no requirement of **any** production expectancy affiliated with **any** of these jobs. *See* DOT, 920.587-018, 1991 WL 687916; DOT 361.687-018, 1991 WL 672992; and DOT, 706.684-022, 1991 WL 679050).

### XI.  CONCLUSION

For these reasons, the Magistrate recommends that pursuant to sentence four of 42 U. S. C. § 405(g), the Court remand this case to the Commissioner to assess Plaintiff's RFC, whether he has the ability to do sustained work related physical and mental activities in a work setting on a regular and continuing basis, and whether this new assessment affects the finding of disability. The Magistrate also

recommends that the Court terminate the referral to the undersigned Magistrate.


                                                                       /s/Vernelis K. Armstrong
                                                                       United States Magistrate Judge


Date: January 25, 2011

### XII. NOTICE

Please take notice that as of this date the Magistrate's report and recommendation attached hereto has been filed. Pursuant to Rule 72.3(b) of the LOCAL RULES FOR NORTHERN DISTRICT OF OHIO, as amended on December 1, 2009, any party may object to the report and recommendations within fourteen (14) days after being served with a copy thereof. Failure to file a timely objection within the fourteen-day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure. The objecting party shall file the written objections with the Clerk of Court, and serve on the Magistrate Judge and all parties, which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. Any party may respond to another party's objections within fourteen days after being served with a copy thereof.